**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| PRIME INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-478 |
| | ) | |
| DARNELL WRIGHT, ALI FARUQ, | ) | |
| DEVAL SONEJI, RITEWAY | ) | |
| TRUCKING, INC., and RITEWAY | ) | |
| TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment filed by Defendant

Darnell Wright (ECF No. 24). Plaintiff Prime Insurance Company filed a response in opposition

to the motion (ECF No. 27) and Wright filed a reply brief (ECF No. 30). For the reasons set forth

below, the motion is GRANTED.

**I. Background.**

On November 12, 2013, Decardo Humphrey (not a party in this case) was driving a truck

for Defendant Riteway Trucking when he was involved in a collision with Defendant/Movant

Darnell Wright. Wright filed suit against Riteway Trucking, Riteway Transportation and

Humphrey (the "Riteway Defendants") in the Allen Superior Court seeking damages for personal

injuries he sustained in the crash. The Riteway Defendants did not answer Wright's state court

Complaint so Wright obtained a default judgment. The state court entered an Order of Default

Judgment on August 20, 2015, holding that the Riteway defendants were in default and entering

judgment in favor of Wright.[1] While the motion for default judgment was pending, Prime Insurance filed a Petition to Intervene due to its potential obligation to defend and indemnify its insured. Also, shortly after Wright filed his lawsuit in state court, Prime filed a Complaint for Declaratory Judgment in this Court seeking a declaration that Prime had no duty to provide coverage or to defend its named insured, Riteway Trucking, Inc., or any other defendant named in Wright's state court Complaint. *Prime Ins. Co. v. Riteway Trucking, Inc., et al.*, No. 1:15-CV-105 (N.D. Ind. 2018). In that case, "[t]his Court ultimately held that Prime did not owe a duty to defend or indemnify Riteway, that Riteway failed to meet its obligations under its insurance policy, and that Riteway and its alter egos shall be liable to Prime for any payments issued under an MCS-90 endorsement to the insurance policy. The Court did not reach whether the MCS-90 endorsement would apply to pay the judgment against Riteway." Defendant Wright's Memorandum in Support (ECF No. 25), p. 3.[2] On October 25, 2018, after this Court's finding of

---

[1] The state court entered judgment as follows: "The Court now finds and concludes that the Defendants . . . are in default for failing to answer or otherwise defend Plaintiff's Complaint for Damages. Evidence regarding Plaintiff's damages is presented and Plaintiff's damages are proven as reflected below. Accordingly, judgment is entered in favor of Plaintiff Darnell Wright and against the Defendants . . . in the amount of Four Hundred Thousand Dollars ($400,000.00)." Defendant's Exh. A (ECF No. 24-1), State Court Order, p. 1. For reasons addressed later in this order, it is important to note that the state court also stated in its order granting default judgment that "Defendants failed to appear, and Intervenor Prime Insurance, Inc. failed to appear for hearing on Plaintiff's Motion for Default Judgment[.] The Court finds proof of service is shown, and particularly that the Intervenor [Prime], by counsel, having filed its Petition to Intervene on July 16, 2015 (one month <u>after</u> the Court issued its Order setting hearing) had notice." *Id.* (underlining in original).

[2] This Court found that "Riteway Trucking, Inc., Ali Faruq, Deval Soneji, and Riteway Transportation, Inc., are alter egos of each other, such that each Defendant is and shall be liable to Plaintiff for any obligation of Riteway Trucking Inc., under the MCS-90 of the policy." *Prime Ins. Co. v. Riteway Trucking, Inc., et al.*, 1:15-CV-105, Order of January 29, 2018 (ECF No. 90). An MCS-90 is an "Endorsement for Motor Carrier Policies of Insurance for Public Liability." This endorsement is required of motor carriers under Sections 29 and 30 of the Motor Carrier Act

no coverage, the Allen Superior Court denied a motion by Prime to set aside the default judgment. The Indiana Court of Appeals affirmed the trial court's order of default and the Indiana Supreme Court denied transfer. *Id*. (citing *Prime Ins. Co. v. Wright*, 133 N.E.2d 749 (Ind. Ct. App. 2019), *trans. denied sub nom., Prime Ins. Inc. v. Wright*, 2020 WL 807005 (Ind. Feb. 13, 2020)). Wright states that "a final judgment has been entered on Wright's claims against Riteway and the sole remaining issue is whether the MCS-90 endorsement included in the policy of insurance by Prime to Riteway applies in this case, which would require Prime to pay the judgment in the Allen Superior Court entered in Wright's favor." *Id*., p. 4.

Prime filed this action for declaratory relief seeking a finding that it is not responsible under the MCS-90 for payment of the judgment rendered in favor of Wright in the state court. Wright "disagrees and seeks payment from Prime under the endorsement." *Id*. Wright moves the Court to find that he is entitled to summary judgment on the issue of the applicability of the MCS-90.

In its response in opposition, Prime argues that Wright's motion "should be denied for three reasons. First, applying the majority trip-specific approach, the driver, Decardo Humphrey . . . was not transporting property at the time of the accident. Therefore, the accident falls outside the scope of the MCS-90. Second, even if the majority rule were not applied, the MCS-90 only applies to the transportation of property by interstate commerce, and Movant has not established that Mr. Humphrey was engaged in interstate commerce. Third, there exists evidence of misrepresentation that, as a matter of public policy, should preclude Plaintiff from recovering

---

of 1980. The MCS-90 issued by Prime to Riteway is attached to Defendant Wright's motion for summary judgment as Defendant's Exhibit B at ECF No. 24-2.

under the MCS-90. For any and/or all of these reasons, Defendant's Motion for Summary

Judgment should be denied." Plaintiff's Response in Opposition (ECF No. 27), p. 1.

**II. Standard of Review.**

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the

moving party may be discharged by 'showing'–that is, pointing out to the district court–that there

is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477

U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts

to the non-moving party to come forward with specific facts showing that there is a genuine issue

for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc*.,

2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502,

507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable

inferences from those facts in the light most favorable to the nonmoving party. *Id*. (citing *Frakes

v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a

motion for summary judgment "is not to sift through the evidence, pondering the nuances and

inconsistencies, and decide whom to believe. The court has one task and one task only: to decide,

based on the evidence of record, whether there is any material dispute of fact that requires a

trial." *Waldridge v. Am. Heochst Corp*., 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is

not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes.  *Id*.

Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if

genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate.  *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

### III. Discussion.

### A. "Transporting property" issue and interstate versus intrastate issue.

MCS-90 endorsements are a product of federal law. As this Court has explained:

Federal law requires common carriers, such as trucking companies, to obtain insurance to cover motor vehicle accidents. *Carolina Casualty Ins. Co. v. Yeates*, 533 F.3d 1202, 1204 (10th Cir. 2008). Related federal regulations require all interstate carriers to maintain insurance or another form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles" under the carrier's permit. 49 C.F.R. §§ 387.301(a), 387.7; *see also Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir. 1986) (noting that ICC regulations are intended "to ensure that an ICC carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its trucking operations"). To satisfy this insurance requirement, the regulations require the attachment of an MCS-90 endorsement to each insurance policy of the carrier, which guarantees payment in the amount of at least $750,000 per accident. 49 C.F.R. §§ 387.7, 387.9. The endorsement creates a suretyship, which obligates an insurer to pay certain judgments against the insured arising from interstate commerce activities, even though the insurance contract would have otherwise excluded coverage. *See Auto-Owners Ins. Co. v. Munroe*, 614 F.3d 322, 327 (7th Cir. 2010); *Carolina Casualty Ins. v. Yeates*, 584 F.3d 868, 881 (10th Cir. 2009); *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 470 (5th Cir. 2005). Thus, "the payment obligation [under an MCS-90 endorsement] is broader than the policy itself and applies regardless of "'whether or not each motor vehicle is specifically described in the policy,' and despite any "condition, provision, stipulation, or limitation contained in the policy.'" *Auto-Owners*, 614 F.3d at 327[.]

*Fairmont Specialty Ins. Co. v. 1039012 Ontario, Inc.*, No. 2:10-CV-070, 2011 WL 3651333, at

*3 (N.D. Ind. Aug. 19, 2011).

Stated broadly, MCS-90 endorsements provide coverage for people injured as a result of the negligence of a trucking company that is engaged in transporting property over the roads and highways. Wright contends that Humphrey was doing exactly that at the time of the collision and so MCS-90 coverage applies. Citing Humphrey's deposition testimony, Wright explains as follows:

> Riteway employed a dispatcher to inform its drivers of the pick up and delivery of loads. [Citing Humphrey Deposition (ECF No. 24-3)), p. 26.] When Humphrey would arrive at the yard in South Holland, [Illinois] he received his trip details from the dispatcher. *Id*. at 29. Riteway coordinated the details of every trip, including contacting the company needing goods shipped, negotiating pricing, and providing instructions to its drivers to pick up the loads. *Id*. at 31-32. Humphrey's routes were often interstate, with loads being taken to and picked up from states such as Illinois, Michigan, Indiana, and Ohio. *Id*. at 34, 40. Regardless of how many days a trip took, Humphrey always started in South Holland. *Id*. at 82, 90. Regardless of the number of stops and loads he delivered during a trip, he was always coming back to Illinois. *Id*. at 91. He would remain on the road until Riteway coordinated a load to get him back to Illinois. *Id*. at 92.
>
> On the morning of the collision, Humphrey received orders from Riteway's dispatch to pick up a load in Fort Wayne, Indiana. *Id*. at 36-37. He received dispatch orders from Riteway on his cellular phone. *Id*. at 46. He had recently dropped off another load and was on his way to pick up another load in Fort Wayne because Riteway did not want its drivers driving without a load. *Id*. at 37, 39. Humphrey was instructed to pick up the load in Fort Wayne and to take it to Illinois. *Id*. at 49. When the collision with Wright occurred, Humphrey was just down the street from the company where he was to pick up the load to be taken to Illinois. *Id*. at 45. At the time of the collision, Humphrey was not carrying a load. *Id*. at 74. After the collision with Wright, Humphrey called Riteway to report the collision; Riteway then instructed Humphrey to complete the pickup and return to Illinois as planned. *Id*. at 50-52. The load was specifically intended to get Humphrey back to Illinois. *Id*. at 84-85. Humphrey did in fact return the load to Illinois and parked at the South Holland yard. *Id*. at 94.

Defendant's Memorandum in Support (ECF No. 25), pp. 5-6 (citing Humphrey Deposition (ECF No. 24-3)).

6

Humphrey's recollection of the accident, and especially his recollection of where he was coming from on that day, is fuzzy at best. He testified as follows:

Q. If you had to go pick up the truck, it was never anywhere except for the South Holland yard; correct?

A. Except for the South Holland yard. That was it.

Q. Okay. So you testified earlier that you think you had to drop off something in Indiana before this accident happened; is that right?

A. Right. Right. Right.

Q. And I'm not sure if you testified to it. I apologize if you did. Do you remember what city that was in where the drop-off was?

A. I couldn't tell you. If I was in Indiana, I was probably already in–If I was in Fort Wayne, then I was probably somewhere already in Indiana or damned close.

Q. All right. All right. But before that drop-off, your trip started in [South] Holland; correct?

A. In South Holland, yeah.

*Id.*, pp. 81-82. Based on this testimony, Wright contends that Humphrey was engaged in the transportation of property in interstate commerce and so MCS-90 coverage applies and Prime should pay the judgment rendered in favor of Wright by the Allen Superior Court.

Prime argues that since Humphrey "was not transporting property at the time of the accident[,]" the MCS-90 endorsement does not apply. Plaintiff's Response in Opposition (ECF No. 27), p. 1. It is undisputed that at the moment of the collision, Humphrey's trailer was empty. Prime also argues that the MCS-90 endorsement does not apply because Wright has failed to establish that Humphrey was engaged in interstate commerce at the time of the collision. Prime insists that "[v]iewing Humphrey's testimony in a light most favorable to Plaintiff as the non-

movant, Humphrey's testimony does not provide sufficient evidence that he was engaged [in] transportation of property in interstate commerce at the time of the accident as required for the MCS-90 to apply. Rather, Humphrey's testimony was that he was not transporting property at all, and that he may not have been coming from out of state." *Id.*, p. 2. Prime bases its argument on the fact that Humphrey testified in his deposition "that he did not have a great memory of the accident, nor the days leading up to and just after the accident. . . . Humphrey testified that he does not know where he had been in the days leading up to the accident, nor where or when he dropped off a load in Indiana. . . . He testified he may have already made multiple trips in the Sate of Indiana: 'Q. Okay. So you don't exactly recall where you were in the morning of November 12, 2013; is that fair? A. No. I think I might have already been in Indiana.' . . . Humphrey testified he was not transporting any property at the time of the car accident. . . . He does not recall the circumstances or time of receiving the call from dispatch, informing him of his next pickup location. . . . When the accident occurred, Humphrey was lost and did not know the location of his next pickup. . . . Furthermore, he does not know whether he would have delivered goods he picked up to Indiana, Illinois, or another state. However, as a result of the accident, he had to drive back to the company's lot [in Illinois] to switch out to another tractor." *Id.*, p. 3 (internal citations to Humphrey deposition omitted). Therefore, according to Prime, since Humphrey was not transporting property at the moment of the collision, and since Wright does not establish that Humphrey was engaged in "interstate commerce" at the time, summary judgment should be denied. *Id.*, generally.

Relying primarily on a Fifth Circuit decision in *Canal Ins. Co. v. Coleman*, 625 F.3d 244 (5th Cir. 2010), Prime contends that this Court should employ what is known as the "trip-specific

approach" to analyzing whether the MCS-90 applies in this case. Prime argues that "the trip-specific approach is used by a majority of Circuit Courts. As noted in *Coleman*, 'Other courts have varied as to whether they determine the MCS-90's application at the time of the loss, but ours appears to be the majority approach.'" *Id.*, p. 11 (quoting *Coleman*, 625 F.3d at 251). Prime states that under the "trip-specific" method of analysis, "the relevant consideration for deciding whether the MCS-90 applies is whether the driver is presently transporting property in interstate commerce." *Id.* Prime contends that Humphrey was not doing either: he was not transporting property (given that his trailer was empty at the moment of the collision) and his deposition testimony does not establish that he was engaged in interstate commerce. So, according to Prime, since Humphrey was driving an empty tractor-trailer at the time of the collision, he was not "transporting property" and the MCS-90 does not apply under the "trip-specific approach." And, since his recollection of the accident is foggy, his deposition testimony fails to establish that he was actually engaged in *interstate* rather than *intrastate*, commerce, thereby creating a genuine issue of material fact that precludes summary judgment. Prime also points to another portion of Humphrey's testimony wherein he stated that he did not remember whether the load he was about to pick up was supposed to be delivered across state lines:

> Q. Okay. So that load was going to delivered to Illinois; is that right?
>
> A. It would be delivered–See, that's the thing. I don't remember where it was going. But I had to go back to the [South Holland, Illinois] yard because of the truck, because the front end of the truck was falling off. I made sure I got back to the yard to get that front end repaired.

Plaintiff's Response in Opposition (ECF No. 27), p. 16 (citing Humphrey Deposition, Plaintiff's Exhibit C (ECF No. 27-3), pp. 84-85). Prime argues that this creates a genuine issue of fact  and

9

summary judgment must be denied.

In *Canal v. Coleman*, the Fifth Circuit held as follows:

After reading the plain text of the MCS-90 and § 30, we conclude that the endorsement covers vehicles only when they are presently engaged in the transportation of property in interstate commerce. We reason as follows: the MCS-90 applies to vehicles subject to § 30 of the Motor Carrier Act. Section 30 requires minimum levels of financial responsibility, which must be sufficient to "satisfy liability . . . for the transportation of property in interstate commerce." Thus, the MCS-90 is a way of conforming with statutory minimum-financial-responsibility requirements. And because those requirements exist to "satisfy liability . . . for the transportation of property," it follows that the MCS-90 must cover liabilities "for the transportation of property." Nothing in the MCS-90's text indicates that it covers other kinds of liabilities, i.e., liabilities incurred outside of the transportation of property.

. . .

Our decision today follows the reasoning of *Garcia* and our unpublished opinion in *Galindo*. The commonality in our reasoning is this: in all these cases, we determined the MCS-90's applicability with reference to time of the loss. As discussed above, see supra Part III.A, we believe that the MCS-90's text clearly compels this approach.

Other courts have varied as to whether they determine the MCS-90's application at the time of the loss, but ours appears to be the majority approach. *See, e.g., Century Indem. Co. v. Carlson*, 133 F.3d 591, 595 (8th Cir. 1998) (agreeing with "the determination that the grain in question in this case at the time of the accident traveled in interstate commerce" (emphasis added)); *Canal Ins. Co. v. J. Perchak Trucking, Inc.*, 3:CV-07-2272, 2009 WL 959596, at *2 (M.D.Pa. Apr. 6, 2009) (denying summary judgment because "[c]onsideration of the important issues presented in this case should be made only in the context of a concrete determination as to whether the insured's vehicle was involved in interstate or intrastate commerce *at the time of the accident*" (emphasis added)); *Canal Ins. Co. v. Paul Cox Trucking*, 1:05-CV-2194, 2006 WL 2828755, at *4 (M.D.Pa. Oct. 2, 2006) (holding that a federal court has jurisdiction over the question of whether truck was "engaged in interstate commerce at the time of the accident" (emphasis added)); *Kolencik v. Progressive Preferred Ins. Co.*, 1:04-CV-3507, 2006 WL 738715, at *7 (N.D.Ga. Mar. 17, 2006) ("Based on the foregoing, the court concludes that endorsement MCS-90 plays no role in the instant accident because it involved only intrastate commerce from Cartersville, Georgia to Acworth, Georgia with no intention of the dirt ever going beyond Acworth."); *Branson v.*

> *MGA Ins. Co.*, 673 So.2d 89 (Fl.Dist.Ct.App. 1996) (declining to apply the MCS-
> 90 to purely intrastate transportation); *Gen. Sec. Ins. Co. v. Barrentine*, 829 So.2d
> 980, 984 (Fl.Dist.Ct.App. 2002) ("The issue is not whether a truck might be used
> for an interstate shipment in the future. That much could be said of nearly any
> tractor-trailer rig. Rather, *the issue is whether the injury in question occurred
> while the truck was operating in interstate commerce.*" (emphasis added)). *But
> see, e.g., Royal Indem. Co. v. Jacobsen*, 863 F.Supp. 1537, 1541 (D.Utah 1994)
> ("In the court's view, Royal's 'trip specific' reading of the Holdens' ICC
> endorsement (or any ICC endorsement for that matter) is incorrect."); *Travelers
> Indem. Co. of IL v. W. Am. Specialized Transp. Servs., Inc.*, 235 F.Supp.2d 522,
> 529-30 (W.D.La. 2002) (holding that the truck's procurement or lease agreement,
> rather than the circumstances of the particular loss, determine the MCS-90's
> application); *Reliance Nat'l Ins. v. Royal Indem. Co.*, 99-Civ.-10920, 2001 WL
> 984737, at *4-7 (S.D.N.Y. Aug. 24, 2001) (same).
>
> In sum, the weight of authority from this Circuit and beyond supports our
> conclusion that **the MCS-90 does not cover vehicles when they are not
> presently transporting property in interstate commerce.**

*Canal Ins. Co. v. Coleman*, 625 F.3d 244, 249, 250-52 (5th Cir. 2010) (boldface added). It is

important to note that the court in *Coleman* expressly stated that "[g]iven the statute's [49 U.S.C.

§ 13102] broad terms, it is at least arguable that [the truck driver's] conduct at the time of the

accident could be termed 'transportation of property.' However, because the district court

accepted [Plaintiff's] stipulation that it was not, **we do not reach that question**." *Id*. at 252

(boldface added). (In *Coleman*, the accident that injured plaintiff occurred while the truck driver

was backing his truck, *sans* trailer, into his own driveway. Plaintiff, therefore, stipulated that the

driver was not transporting property at the time of the accident.)

Prime notes that the *Coleman* decision reflects the majority approach, but also

acknowledges that no courts in the Seventh Circuit have employed the method. Still, Prime

insists that "The Fifth Circuit explained that the text of the MCS-90 'compels' the Court to

consider only whether the driver was transporting property at the <u>time of loss</u>, also referred to as

the 'trip-specific' approach." Plaintiff's Response in Opposition (ECF No. 27), p. 10 (underlining in original).

Wright argues that the "trip-specific approach" is not the proper method of analysis and that the recent Indiana case of *Progressive Se. Ins. Co. v. B&T Bulk LLC*, 170 N.E.3d 1125 (Ind. Ct. App. 2021), is on point.[3] The court in *B&T Bulk* concluded as follows:

> On appeal, the insurance company makes two arguments that the MCS-90 endorsement doesn't apply: (1) the truck driver was on an intrastate-not interstate–trip at the time of the accident and (2) the truck wasn't carrying any property at the time of the accident. As for (1), even though the majority of courts have held the MCS-90 endorsement only applies to the interstate transportation of property under the federal Motor Carrier Act, Indiana Code section 8-2.1-24-18(a) applies this requirement to intrastate transportation. As for (2), we find the MCS-90 endorsement applies when a truck, although empty, is on its way to pick up a load. We therefore affirm the trial court.

*B&T Bulk*, 170 N.E.3d at 1127. Based on that holding, Wright argues that "[e]ven if Riteway was not engaged in interstate commerce, the Indiana Court of Appeals, as an issue of first impression, recently decided the case of *Progressive Se. Ins. Co. v. B&T Bulk LLC*, . . . and determined that Indiana's adoption of federal motor carrier laws and regulations extended the MCS-90 endorsement to cover wholly intrastate commerce." Defendant Wright's Memorandum in Support (ECF No. 25), pp. 15.

---

[3] The *B&T Bulk* case is currently under review by the Indiana Supreme Court, which granted transfer on October 28, 2021, shortly after briefing was completed in this case. *Progressive Se. Ins. Co. v. B&T Bulk LLC*, 170 N.E.3d 1125 (Ind. Ct. App. 2021), reh'g denied (July 1, 2021), transfer granted, opinion vacated sub nom. *Progressive Se. Ins. Co. v. Brown*, 2021 WL 5173489 (Ind. Oct. 28, 2021). Consequently, Wright cannot rely on it nor can this Court consider it when deciding the motion for summary judgment. The Court discusses the case now only because it helps frame Wright's argument.

12

Even though Wright cannot rely on *B&T Bulk*,[4] his argument finds support in other cases.

Wright cites and discusses the case of *Titan Indem. Co. v. Faitan Enterprises, Inc.*, 237 F. Supp.

3d 343 (D. Md. 2017), which he contends is "a strikingly similar case[.]" *Id.*, p. 13. Wright

argues as follows:

> In *Titan*, the court found that a motor carrier was engaged in interstate commerce even though the truck was empty and on the way to pick up a load at the time of the collision. Looking at the definition of "transportation", the court noted that the broad inclusion of the words "arranging for" in 49 U.S.C. § 13102(23) brought the trip to pick up the load within the realm of interstate transportation as outlined in 49 U.S.C. § 31139. *Titan*, 237 F. Supp. 3d. at 348.
>
> Although the pick up, transport, and drop off of the intended load was to occur solely in the District of Columbia, the court determined that the coordination of the delivery occurred over state lines and was therefore interstate commerce. *Id.* Similar to the case before this Court, the motor carrier and its trucks were located across state lines in Maryland. *Id.* The Maryland motor carrier was contacted by the District of Columbia plant to arrange the pick up and delivery of the load. *Id.* The plant, in contacting the out of state company to arrange the shipment, clearly intended that the motor carrier would cross state lines in order to complete the shipment. *Id.* Thus, the court found there was interstate transportation under the "arranging for" definition of transportation. *Id.*
>
> In contrast, cases that have found no interstate commerce when a truck did not have a load have been based upon the nature of the trip. In *Northland Ins. Co. v. Top Rank Trucking of Kissimmee, Inc.*, 2013 WL 12361936 (M.D. Fla. Jan. 29, 2013), the court concluded there was no interstate transportation because the truck driver was engaged in a personal errand at the time of the collision. Similarly, in

---

[4] Prime contends that the *B&T Bulk* decision would be inapplicable anyway, even if it were good law. Prime argues that *B&T Bulk* involved interpretation and application of Indiana law when deciding that MCS-90 coverage applied to a purely intrastate trip, but that in the present case "[t]he subject policy is an Illinois policy, which was, on its face issued to an Illinois insured, by an Illinois producer, with explicit reference to the Illinois Department of Insurance. The result is that the contract was plainly negotiated under Illinois law, not that of the State of Indiana." Plaintiff's Response in Opposition (ECF No. 27), p. 13. The Court need not address this argument given that *B&T Bulk* is no longer valid authority and the Court cannot consider it when analyzing and resolving the issues on summary judgment. More importantly, it is irrelevant, since the Court concludes that the undisputed evidence establishes that Humphrey was in fact engaged in interstate–not intrastate–commerce at the time of the accident.

> *Canal Ins. Co. v. Coleman*, 625 F.3d 244 (5th Cir. 2010), the Fifth Circuit found that the parties' stipulation that the motor carrier was not engaged in the transportation of property rendered the MCS-90 inapplicable. *See also Brunson ex rel. Brunson v. Canal Ins. Co.*, 602 F. Supp. 2d 711 (D.S.C. 2007).
>
> Although dealing with unladen trucks, those and similar cases are not on point with the present case, where Humphrey was not engaged in a personal errand, his trip was specifically arranged by Riteway to occur across state lines, his orders to proceed with the pick up were delivered across state lines by Riteway's dispatch, and the property was arranged to be picked up in Indiana and delivered across state lines in Illinois. Instead, this case is more closely related to *Titan*, as explained above.

Defendant Wright's Memorandum in Support (ECF No. 25), pp. 14-15. According to Wright, Humphrey was engaged in the transportation of property in interstate commerce at the time of the accident, even though he was hauling an empty trailer, and MCS-90 coverage is still triggered, pursuant to the reasoning in *Titan* and similar cases. *See Lyles v. FTL Ltd., Inc.*, 339 F. Supp. 3d 570, 577 (S.D.W. Va. 2018) ("'Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by [the] shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation.'") (quoting *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 223-24 (2d Cir. 2002) (in turn quoting *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1977)). In other words, "the existence of the requisite interstate nexus may be determined by looking to the intent of the goods' seller or shipper with respect to the goods' destination . . . 'at the time the transportation commenced.'" *Lyons*, 681 F.3d at 58.

It should be clear by now that courts are divided over whether MCS-90 coverage applies to intrastate as well as interstate trips (and whether it applies to empty trucks). This split is summarized succinctly in the following treatise:

There is a split of authority as to whether the MCS-90 applies to intrastate accidents. A minority of courts has held that the endorsement may apply to intrastate accidents, as well as interstate accidents. Those courts have rejected a "trip specific" approach centered on the character of the shipment itself as "intrastate" or "interstate," and based their decisions on a determination that the ICC had jurisdiction over the trip, on public policy grounds and the Motor Carrier Act's stated purpose of protecting members of the general public who are injured in accidents involving uninsured authorized carriers, and on state statutes incorporating the 49 C.F.R. part 387 federal minimum financial responsibility limits into state law by reference, thus requiring intrastate motor carriers to have in effect a certificate of liability insurance in the same amount as the federal minimum liability limits.

In *Heron v. Transportation Casualty Insurance Co.*, the Virginia Supreme Court held that the endorsement was triggered in the case of a purely intrastate accident, reasoning that there was nothing in the language of the endorsement that limited its application to interstate accidents.

In *Canal Insurance Co. v. YMV Transport, Inc*., the U.S. District Court for the Western District of Washington considered whether an MCS-90 endorsement is triggered where the vehicle was engaged in interstate transport, but was not hauling goods in a "for hire" capacity at the time of the accident. The Court noted that the majority of cases that had used a "trip specific" approach to determining MCS-90 applicability had examined whether the trip was "interstate," or whether the cargo was an "exempt" commodity under the FMCSA. Noting that the purpose of the MCS-90 is to protect injured members of the public, the Court rejected the "trip specific" approach and denied the insurer's motion for summary judgment, reasoning that evidence that the truck was placarded and operating under the defendant's DOT number created a genuine issue of material fact as to whether the transportation was "for-hire."

Most courts, however, have held that the MCS-90 applies only where the Department of Transportation has jurisdiction under 49 U.S.C.A. § 13501 and that it does not apply to an accident that occurs during a purely intrastate trip. A liberal test has been used to determine whether a motor carrier was engaged in interstate transportation based on the "totality of the circumstances surrounding the shipment," although, under a "trip specific" approach, a determination that the MCS-90 applies requires a finding that the accident occurred while the vehicle was presently transporting property, in a for-hire capacity, in interstate commerce.

MCS-90 protection is afforded the public for the use of any vehicle operated by the named insured in the course of its business, even though the actual use of the vehicle is outside the scope of the main thrust of the insured's business, and even

if the vehicle is not covered under the insurance policy.

Schermer & Schermer, § 2:15. Motor carrier financial responsibility–The MCS-90

endorsement–Obligation to pay under the MCS-90, 1 Auto. Liability Ins. 4th § 2:15 (October

2021 Update) (footnotes omitted).

In the present case, the Court need not take a position on this intrastate versus interstate

issue because the evidence establishes that Humphrey was engaged in interstate commerce at the

time of the accident. His inability to recall whether he was already in Indiana on the morning of

the accident, which Prime insists raises a fact issue, is immaterial. Even assuming Humphrey *was*

already in Indiana on the morning of the accident, that fact would not render his trip a "purely

intrastate" one so as to preclude application of MCS-90 coverage. Again, as Wright points out,

"Humphrey was not engaged in a personal errand, his trip was specifically arranged by Riteway

to occur across state lines, his orders to proceed with the pick up were delivered across state lines

by Riteway's dispatch, and the property was arranged to be picked up in Indiana and delivered

across state lines in Illinois." Defendant Wright's Memorandum in Support (ECF No. 25), p. 15.

As to the issue of the "transportation of property," Prime urges a strict reading of the

statute and concludes that since Humphrey was not transporting property at the time of the

collision, MCS-90 coverage is not triggered. Wright, of course, contends that because Humphrey

had dropped off a load in Indiana and was on his way to pick up another load in order to return to

Illinois, he was engaged in the transportation of property even though his trailer was empty at the

precise moment of the accident. Wright's argument is supported by the reasoning and holdings in

*Titan* and other cases that have applied a "totality of the circumstances" approach to analyzing

the issue. Prime argues that a plain reading of the applicable statute and the MCS-90 itself makes

clear that coverage does not apply to an empty truck, a position supported by *Coleman* and other cases employing the "trip-specific approach."

It seems very logical to conclude that even empty trucks, en route to pick up loads to continue their trip, are engaged in interstate commerce, whereas trucks being driven for personal errands (*see Northland Ins. Co. v. Top Rank Trucking of Kissimmee, Inc.*, 2013 WL 12361936 (M.D. Fla. Jan. 29, 2013)) and drivers returning home (such as the driver in *Coleman*, who was backing into his driveway when he collided with another vehicle) are clearly *not* engaged in transporting property in interstate commerce. So it is easy to draw a distinction between trucks being driven for personal purposes and trucks transporting property. In this case, while it is undisputed that Humphrey was not transporting property, it is also undisputed that he was not on a personal errand or returning home after a trip. Under these facts, the court's holding in *Titan* is logical and reasonable: Humphrey's "trip to pick up the load [was] *within the realm of interstate transportation as outlined in 49 U.S.C. § 31139*." *Titan*, 237 F. Supp. 3d. at 348 (italics added).

The Court concludes that the "totality of the circumstances" analysis endorsed by *Titan* and similar cases, rather than the "trip-specific approach," is the more logical and reasonable method of analysis given the facts of this case. Under this framework, Humphrey was engaged in the transportation of property notwithstanding the undisputed fact that he was not hauling a load at the precise moment of the collision with Wright. Accordingly, the Court rejects Prime's argument that summary judgment should be denied on the basis that Humphrey was not transporting property at the time of the collision.

The evidence establishes that Humphrey was engaged in interstate commerce. He testified that he always began his trips in South Holland and always ended those trips back in South

Holland. To reiterate his testimony on this issue: "Riteway employed a dispatcher to inform its drivers of the pick up and delivery of loads. When Humphrey would arrive at the yard in South Holland, [Illinois] he received his trip details from the dispatcher. Riteway coordinated the details of every trip, including contacting the company needing goods shipped, negotiating pricing, and providing instructions to its drivers to pick up the loads. Humphrey's routes were often interstate, with loads being taken to and picked up from states such as Illinois, Michigan, Indiana, and Ohio. *Regardless of how many days a trip took, Humphrey always started in South Holland. Regardless of the number of stops and loads he delivered during a trip, he was always coming back to Illinois.* He would remain on the road until Riteway coordinated a load to get him back to Illinois." Wright's Memorandum in Support (ECF No. 25), p. 5 (internal citations to Humphrey Deposition omitted) (italics added).

The issues in this case turn entirely on Humphrey's testimony, which is the only evidence presented on summary judgment, and Prime presents no evidence to dispute that testimony. In other words, the evidence before the Court is undisputed. Instead of presenting evidence to refute Humphrey's factual recitation, Prime offers only argument—contending that since Humphrey *may have already* been in Indiana on the day of the collision, and since the collision happened in Indiana while he was en route to pick up another load, the Court should conclude that he was engaged in a purely intrastate trip at the time of the accident. This argument is unavailing. Humphrey's testimony makes clear that he was engaged in the interstate transport of property. Riteway dispatched him from the South Holland yard and he drove to Indiana to drop off a load. He was then instructed to pick up another load in Indiana and return to South Holland. Humphrey could not recall where the load he picked up after the accident was intended to go, but he testified

that he returned to South Holland after the accident as he always did. Prime presents no evidence to refute Humphrey's testimony–only argument. Prime contends that since Humphrey testified that he *may have already been* in Indiana on the day of the accident, and since the accident occurred in Indiana, and since Humphrey could not recollect where he was going to take the next load he picked up, there exists a fact issue about whether Humphrey was engaged in interstate commerce and summary judgment must be denied for that reason. In short, Prime cherry picks portions of Humphrey's testimony in an attempt to create a genuine issue of material fact about whether Humphrey was engaged in interstate transportation.

Prime's argument is unavailing because Prime presents no evidence to refute Humphrey's testimony, which, notwithstanding his lack of recollection of certain events, establishes that Humphrey, at the direction of his employer, Illinois-based Riteway, left Riteway's South Holland yard in the days before the accident, traveled to Indiana where the accident occurred (and possibly other states before that, although that is not clear from the record), and returned to South Holland after the accident. Prime presents no evidence to refute these facts. Instead, Prime argues that these undisputed facts support only one conclusion: that a fact issue exists as to whether Humphrey was engaged in interstate commerce given that he "may have already been in Indiana" on the morning of the accident and the accident occurred in Indiana. However, the line of cases on which Prime relies, in which courts have found that MCS-90 coverage did not apply because the driver was *not* engaged in interstate commerce are easily distinguishable from the present case. *See Lyles v. FTL Ltd., Inc*., 339 F. Supp. 3d 570, 578 (S.D.W. Va. 2018) ("Because the accident in this case occurred during a trip that *neither crossed state lines nor was intended to cross state lines*, the MCS-90 endorsement does not apply.") (italics added); *Northland Ins. Co.*

*v. Top Rank Trucking of Kissimmee, Inc.*, No. 611-CV-1126, 2013 WL 12361936, at *4 (M.D.

Fla. Jan. 29, 2013) ("the MCS-90 . . . does not compel Plaintiff to provide coverage for this

accident because Defendant Hines was on a personal trip, not transporting property in interstate

commerce, at the time of the accident."); *Kolencik v. Progressive Preferred Ins. Co.*, 1:04-CV-

3507, 2006 WL 738715, at *7 (N.D. Ga. Mar. 17, 2006) ("the court concludes that endorsement

MCS-90 plays no role in the instant accident because it involved only intrastate commerce from

Cartersville, Georgia to Acworth, Georgia with *no intention of the* [cargo] *ever going beyond*

Acworth.") (italics added); *Branson v. MGA Ins. Co.*, 673 So. 2d 89 (Fl. Dist. Ct. App. 1996)

(MCS-90 coverage not triggered where it was undisputed that truck was engaged in a purely

intrastate trip and was carrying cargo expressly exempted from ICC jurisdiction.); *Coleman*,

*supra* (driver not engaged in interstate commerce while backing into his driveway).

       In the present case, employing the totality of the circumstances analysis, the undisputed

evidence establishes that Humphrey was engaged in the transportation of property in interstate

commerce when the accident with Wright occurred. He began his trip in South Holland, Illinois,

and transported property to Indiana at the direction of Riteway. He had delivered property to a

location in Indiana and was en route to pick up another load, again at the direction of Riteway, so

he would not be hauling an empty trailer back to Illinois. While Humphrey was unable to

remember whether he was going to deliver the load he picked up to another state or to another

location in Indiana, it is undisputed that he returned to South Holland after the accident,

transporting property, all at the direction of Riteway. "The determination of whether

transportation is 'intrastate' or 'interstate' is based on the "essential character of the commerce."

*Titan*, 237 F. Supp. 3d at 343; *Southern Pac. Transp. Co. v. ICC*, 565 F.2d 615, 617 (9th Cir.

1977) (discussing the reach of Interstate Commerce Commission's jurisdiction and concluding that "whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation."); *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74-75 (2d Cir. 2001) ("'The nature of a shipment is not determined by a mechanical inspection of the bill of lading nor by when and to whom title passes but rather by the essential character of the commerce, reflected by the intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement.'") (quoting *Swift Textiles, Inc. v. Watkins Motor Lines, Inc*., 799 F.2d 697, 699 (11th Cir. 1986)).

The Court also takes into consideration the purpose and policy behind MCS-90 endorsements: ensuring that members of the public who are injured as a result of the negligence of a trucking company are able to recover damages for those injuries. *See Canal Ins. Co. v. YMV Transp., Inc*., 867 F. Supp. 2d 1099, 1110 (W.D. Wash. 2011) (rejecting the trip-specific approach to determining whether a motor-carrier is "for hire" under the Motor Carrier Act because "[s]uch an approach undermines the primary purpose of the MCS-90, which is 'to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers.'") (internal citation omitted); *Illinois Nat. Ins. Co. v. Temian*, 779 F. Supp. 2d 921, 927-28 (N.D. Ind. 2011) (purpose of MCS-90 coverage is to protect the public by ensuring there is at least $750,000 available for injury "'resulting from negligent operation, maintenance, or use of the motor vehicle.'") (quoting 49 U.S.C. § 31139); *Triple Crown Servs. Co. v. Ins. Co. of Pennsylvania*, No. 1:05CV320, 2006 WL 2917176, at *9 (N.D. Ind. Sept. 18, 2006) ("The

MCS-90 Endorsement was created in order to ensure that members of the public are protected in the event they sustain compensable damages as a result of the activities of a trucking company. The purpose of the regulation is to ensure that trucking companies maintain adequate financial responsibility to pay claims or judgments against them."); *Carolina Cas. Ins. Co. v. E.C. Trucking*, 396 F.3d 837, 841 (7th Cir. 2005) ("'It is well-established that the primary purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgments from negligent authorized interstate carriers.'") (quoting *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000)); *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 878 (10th Cir. 2009) (MCS-90 "endorsement is a safety net in the event other insurance is lacking.") (citing *Canal Ins. Co. v. Carolina Cas. Ins. Co.*, 59 F.3d 281, 283 (1st Cir.1995)).

Based on the public policy reasons for MCS-90 endorsements, coupled with the undisputed facts of this case, which establish, under a totality of the circumstances analysis (i.e., an "essential character of the commerce" analysis), that Humphrey was engaged in the transportation of property in interstate commerce at the time of the accident, the Court concludes that Wright is entitled to summary judgment on the issue of the applicability of MCS-90 coverage in this case.

**B. Collusion issue.**

Prime argues that "[a]s a matter of public policy, the sham nature of the [state court] judgment and potential for collusion should preclude Wright from recovering under the MCS-90." Plaintiff's Response in Opposition (ECF No. 27), p. 19. In support of this argument Prime asserts as follows:

In this matter, Wright's actions and state court rulings allowed Defendant Wright

> to effectively choose the amount of damages he wanted without allowing Prime to
> contest the issues or damages. The result was a sham judgment: a judgment
> against several parties from whom Wright had no intention of collecting. Rather,
> Wright's focus was on collecting under the MCS-90 against Prime: a third-party.
> Allowing recovery in a case like this encourages fraud and collusion and corrupts
> the judicial process by basing the recovery on a fiction. In fact, there is evidence
> in this matter that [Wright] was willing to collude and/or induce one of the
> underlying Defendants to sign a false or misleading affidavit in order to further its
> end goal of collecting its judgment from Prime. As a matter of public policy and
> the express intent of the MCS-90 provision, Wright should not be able to collect
> the sham default judgment obtained at the state trial court level.

*Id.* The affidavit Prime refers to is one signed by Humphrey on August 20, 2020, five years after

entry of the state court's judgment, in which Humphrey states: "At the time of the collision, I was

operating a truck at the direction of my employers and had begun my trip outside the State of

Indiana prior to traveling into the state to transport a load of goods." Humphrey Affidavit,

Plaintiff's Exhibit D (ECF No. 27-4). Prime contends that Wright's counsel prepared this

affidavit (in an obvious attempt to establish that Humphrey was, in fact, engaged in interstate

commerce) and got Humphrey to sign it by promising him that by "signing the affidavit [he]

would be 'done' with the fallout from the car accident and he would be 'left alone' moving

forward." Plaintiff's Response in Opposition (ECF No. 27), p. 23. The Court need not delve

deeper into the details of Prime's allegations. In the end, Prime's argument is that the Court

should deny summary judgment because of alleged infirmities in the underlying state court

judgment:

> Wright's default judgment was thus never tested on the merits. Wright's efforts to
> collect from a third-party, Prime bears the potential for abuse, fraud or collusion.
> This is not merely theoretical–there are several indications of concern–including
> the medical evidence that Wright claimed to need a surgery as a result of the
> accident, when he already needed that surgery, combined with the effort to obtain
> favorable testimony from Humphrey by leading him to believe that he would then
> be excused from testifying.

. . .

Here, there is evidence that the claimed injury preexisted the accident, combined with an affidavit that was misleading, at best.

*Id*., pp. 22-24.

Wright adamantly denies the accusations of collusion. Wright also notes that "Prime asks this Court to deny summary judgment due to its 'concern over misrepresentation or collusion', citing an affidavit . . . signed by Riteway's driver, Decardo Humphrey . . . . Of particular note, however, is that Wright did not designate the Affidavit as evidence in support of his Motion for Summary Judgment, instead relying on Humphrey's testimony during his deposition that was noticed and taken by Prime. Prime has attempted to create an issue of fact by designating the Affidavit, even though Wright does not rely on any portion thereof." Defendant Wright's Reply (ECF No. 30), pp. 1-2. Wright further asserts that "[i]n perhaps the most egregious portion of its brief, Prime makes accusations of fraud collusion, and corruption extending not just to Wright, but to the Allen Superior Court, the Indiana Court of Appeals, and the Indiana Supreme Court, all without any evidence in support. . . . Prime's arguments regarding the 'sham' nature of the judgment are yet another violation of the Rooker-Feldman doctrine. Prime asks this Court to reopen the judgment, which has already been reviewed and affirmed through the Indiana appellate courts. . . . Judge Bobay heard and reviewed the evidence supporting Wright's claims and found that the evidence supported the judgment entered." *Id*., p. 12. Also, as this Court noted in footnote one above, "the state court also stated in its order granting default judgment that 'Defendants failed to appear, and Intervenor Prime Insurance, Inc. failed to appear for hearing on Plaintiff's Motion for Default Judgment[.] The Court finds proof of service is shown, and

24

particularly that the Intervenor [Prime], by counsel, having filed its Petition to Intervene on July 16, 2015 (one month <u>after</u> the Court issued its Order setting hearing) had notice.'"

The Court agrees with Wright that Prime's argument that the underlying state court judgment was a "sham," or was somehow obtained by nefarious or questionable means, constitutes an improper challenge to the state court's judgment in contradiction of *Rooker-Feldman*. And even if the argument was properly before the Court, it is unavailing.

**C. Interest and costs.**

Wright also moves for summary judgment on the issue of interest and costs, contending that he is entitled to recover interest and costs as part of his final state court judgment. He argues that if he recovers under the MCS-90, Prime will be liable "in the amount of $400,000, *plus costs and interest at the statutory rate of eight-percent (8%)*[.]" Motion for Summary Judgment (ECF No. 24), p. 3 (italics added). Wright contends that Indiana law provides that "'post-judgment interest is statutorily mandated for money judgments and Indiana Code Section 24-4.6-1-101 provides post-judgment interest following a judicial determination of arrearage without the necessity of a specific request for interest.'" Defendant Wright's Memorandum in Support (ECF No. 25), p. 21 (quoting *McKibben v. Kaiser*, 106 N.E.3d 529 (Ind. Ct. App. 2018)).

In response, Prime argues, without supporting authority, as follows:

> The MCS-90 Endorsement provides that the insurer . . . agrees to pay, within the limits of liability described herein, any final judgment recovered against the Insured for **public liability** resulting from negligence in the operation, maintenance or use of motor vehicle . . ." (See Defendant's Motion for Summary Judgment, Dkt. 24, Ex. B.) (emphasis added). The MCS-90 defines "public liability" as "liability for bodily injury, property damage, and environmental restoration." (*Id*. at p. 1.) To the extent this Court holds that Wright is entitled to recover against Prime pursuant to the MCS-90, he should only be allowed to recover the facial amount of the judgment for those damages explicitly allowed by

the endorsement and statute. The holding would be consistent with the purpose of the MCS-90 of imposing minimum levels of financial responsibility: "The MCS-90 is the mechanism established by the Department of Transportation to impose the 'minimum levels of financial responsibility' required by § 30 of the Motor Carrier Act. 49 U.S.C. § 31139(b); 49 C.F.R. § 387.7(d)." *Titan*, 237 F. Supp. 3d at 347. Pursuant to the MCS-90 and the relevant statute, Wright is not entitled to pre-judgment and/or post-judgment interest. The MCS-90 only agrees to pay the final judgment amount.

Plaintiff's Response in Opposition (ECF No. 27), pp. 24-25 (emphasis in original).

In his reply, Wright contends that the "final judgment amount" in this case includes

interest and costs as a matter of law, arguing as follows:

Prime's argument against interest being included in the MCS-90 endorsement is confusing at best. Prime seems to argue, without any legal authority to support its claim, that "liability for bodily injury" somehow excludes the interest on that liability. Prime states, "The MCS-90 only agrees to pay the final judgment amount." According to the judgment entered in the Indiana court, Riteway is liable for damages for the bodily injuries sustained by Wright as a result of his collision with Riteway's driver. By operation of law, interest is part of the judgment against Riteway for that liability. *See* I.C. § 24-4.6-1-101.[5] "As a matter of Indiana law, plaintiff was entitled to interest on the personal injury recovery from the date the verdict was rendered." *Moser v. Buskirk*, 452 F.2d 147, 148 (7th Cir. 1971).

Defendant Wright's Reply (ECF No. 30), p. 14. *See also*, *Berkshire Hathaway Homestate Ins.*

*Co. v. Adams*, No. 2:18-CV-1038, 2019 WL 3418594, at *2 (M.D. Ala. July 29, 2019) (holding

that insurer was entitled to receive reimbursement from insured for sums paid under an MCS-90,

---

[5] Indiana Code Section 24-4.6-1-101 states as follows: "Except as otherwise provided by statute, interest on judgments for money whenever rendered shall be from the date of the return of the verdict or finding of the court until satisfaction at:

(1) the rate agreed upon in the original contract sued upon, which shall not exceed an annual rate of eight percent (8%) even though a higher rate of interest may properly have been charged according to the contract prior to judgment; or

(2) an annual rate of eight percent (8%) if there was no contract by the parties."

including interest and costs pursuant to Alabama law); *Herrod v. Wilshire Ins. Co.*, 499 F. App'x

753, 756 (10th Cir. 2012) (district court entered judgment against insurer under MCS-90 in the

amount of $750,000 plus prejudgment interest); *Wells v. Gulf Ins. Co.*, No. 2-05-CV-162, 2006

WL 887402, at *6 (E.D. Tex. Mar. 28, 2006), rev'd on other grounds, 484 F.3d 313 (5th Cir.

2007) ("The goal of the regulatory scheme also requires that the Court reject Gulf's argument

that the MCS-90 does not authorize Wells to collect damages for diminished earning capacity,

mental anguish or pre- and post-judgment interest awarded in the underlying judgment.").

The Allen Superior Court entered judgment in favor of Wright on his personal injury

claim and Indiana law provides that he is entitled to recover interest and costs as part of that

judgment. Accordingly, summary judgment in granted in favor of Wright on this issue.

## CONCLUSION

On the basis of the foregoing, the motion for summary judgment filed by Defendant

Darnell Wright (ECF No. 24) is hereby GRANTED.

It is further DECLARED that Defendant Riteway Trucking Inc.'s driver was engaged in

interstate  commerce at the time of the collision with Defendant Darnell Wright and that the

MCS-90 endorsement applies, obligating Plaintiff Prime Insurance Company to pay the final

judgment entered in the Allen Superior Court in favor of Defendant Darnell Wright, in the

amount of $400,000.

It is further DECLARED that Indiana law provides that Defendant Darnell Wright is

entitled to recover costs and interest, at the statutory rate of eight-percent (8%), as part of the

Allen Superior Court judgment that was entered in favor of Defendant Darnell Wright on his

personal injury claim.

27

Further, the Court finds no just reason for delay and DIRECTS the Clerk to enter a final judgment in favor of Defendant Darnell Wright, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Entered: April 19, 2022

  /s/   William C. Lee  
William C. Lee, Judge
U.S. District Court